IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAP AMERICA, INC., a Delaware corporation, | : : : : | |
| Plaintiff, | : : | Civil Action No.: 2:23-cv-00728 |
| vs. | : : : | |
| ARLENE CAPSIMALIS, an adult individual, | : : : : | |
| Defendant. | : | |

**<u>DECLARATORY JUDGMENT COMPLAINT</u>**

SAP America, Inc. ("SAP" or "Plaintiff"), by and through its undersigned counsel, Duane Morris LLP, brings the following Complaint against Arlene Capsimalis ("Capsimalis" or "Defendant") for Declaratory Judgment, and in support thereof avers as follows:

**<u>INTRODUCTION</u>**

1. This action involves a dispute over payments made under SAP's sales incentive plan to Defendant, a former Senior Solution Sales Executive for SAP. Specifically, SAP inadvertently miscalculated the amount of a commission payable to Defendant in connection with her work on a deal that closed in September 2021, resulting in a $359,402.98 overpayment to Defendant. Quickly realizing its mistake, SAP promptly informed Defendant of this inadvertent miscalculation and that it would recoup the overpayment from her future commissions over the next several months—all in compliance with the binding terms of the incentive plan to which Defendant had agreed. After repaying only a fraction of the amount she owes, however, Defendant abruptly and voluntarily resigned her employment in an effort to

1

evade her repayment obligations and retain the windfall she has received.  Doubling down on these efforts, Defendant now claims that she is entitled to the full amount of the overpayment, that SAP must repay all amounts recovered from her, and that SAP owes her additional amounts in penalties and interest for alleged violations of statutory and common law.  Defendant has threatened to initiate litigation asserting these claims.

2.      Given Defendant's unfounded claims and threatened litigation, SAP seeks a declaration from this Court to resolve the parties' dispute regarding SAP's and Defendant's respective obligations under terms of the governing incentive plan and related documents, *i.e.*, the 2021 SAP Global Incentive Plan Terms and Conditions for Revenue Generating Role (including its Addendum for North America) (together, the "2021 GIP") and incorporated documents, including the applicable Quota Credit Rules (the "QCRs"). [1]

## PARTIES

3.      SAP, a technology company organized and existing under the laws of the State of Delaware, with its principal place of business at 3999 West Chester Pike, Newtown Square, Pennsylvania, provides enterprise software and services for managing accounting, distribution, human resources, and manufacturing functions to its clients.

4.      Defendant is a former SAP employee and is a citizen and resident of the State of California.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties to this action are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

---

[1] The relevant terms of the 2021 GIP, QCRs, and related documents are quoted verbatim herein.

6. The Court has personal jurisdiction over Capsimalis and venue is proper in this judicial district because this dispute is subject to the mandatory and exclusive forum selection clause contained in the 2021 GIP to which Capsimalis agreed. Specifically, the forum selection clause provides that "[a]ny action or proceeding relating to" the 2021 GIP and incorporated documents "will be solely brought in the courts located in the Commonwealth of Pennsylvania either in the United States District Court for the Eastern District of Pennsylvania or in the Court of Common Pleas of Delaware County[.]" In addition, the 2021 GIP provides that its provisions "shall be construed, administered and enforced according to applicable Federal law and the laws of the Commonwealth of Pennsylvania without regard to its conflict of law rules."

7. This is an action for a declaratory judgment pursuant to this Court's authority under 28 U.S.C. §§ 2201 and 2202. SAP seeks a declaration of the rights and legal relations between the parties with respect to the dispute asserted herein.

## STATEMENT OF FACTS

8. SAP employed Defendant as a Senior Solution Sales Executive ("Sales Executive") from January 2018 to May 6, 2022, when she voluntarily resigned her position. Her resignation was effective as of May 27, 2022.

9. Defendant's compensation from SAP included both an annual salary and incentive compensation. In 2021, Defendant's annual salary was $150,000.00. Her eligibility to earn incentive compensation, including commissions, was governed by a written contract she entered into with SAP, namely, her 2021 Sales Letter (the "Sales Letter"), which in turn expressly incorporates by reference the 2021 GIP and QCRs (the Sales Letter, 2021 GIP, and QCRs are hereinafter collectively referred to as the "Plan"). Defendant executed versions of these documents on an annual basis during her employment with SAP.

10. The 2021 GIP specifies that, "[t]o be eligible to participate" in the Plan, Defendant was required, among other things, to "[c]onfirm that [she had] read, understood, and agreed to [her] applicable Revenue Generating Incentive Plan [*i.e.*, the Plan]." The 2021 GIP further specified that signing of the Plan could "be completed in an online tool or hard copy as local requirements dictate," and that "[n]o incentive payments will be made to the Plan Participant unless and until [] acceptance of the Revenue Generating Incentive Plan has been received by the Company."

11. Toward that end, Defendant electronically signed and executed an acceptance of the Plan, her acceptance of which included, in relevant part, the following instructions and acknowledgment:

> To be eligible to receive incentive compensation, you are required to click the acceptance button below to confirm that you have received and accepted your Compensation Plan and quota that has been assigned to you for 2021 . . . By doing so you acknowledge that you have read and agree to be bound by the terms of your 2021 Compensation Plan and the documents incorporated by reference including, but not limited to, the 2021 Terms and Conditions [*i.e.*, the 2021 GIP] and the Global SW License, Cloud & Services Sales 2021 Quota Credit Rules [*i.e.*, the QCRs] and related regional Addendums, and any amendments thereto, and that your act in affixing your electronic DocuSign signature is intended by you to be equivalent to your signature on this document and the forgoing documents incorporated herein.

12. Under the terms of the Plan, Defendant's incentive compensation was driven by her ability to achieve or exceed her assigned annual sales quota for sales and renewals of SAP's cloud-based products and services. Defendant received credit toward her sales quota (a process known as quota crediting) in accordance with the specific terms of the 2021 GIP and QCRs based on the value of qualifying sales of her assigned products.

13. Generally speaking, Defendant received monthly incentive payments calculated by applying the quota attainment percentage achieved to date to her annual target variable incentive amount. For example, if Defendant had an annual sales quota of $1,000,000 and a

target variable incentive of $100,000 for achieving 100% of that quota, she would receive $50,000 in incentive payments for $500,000 in sales (*i.e.*, 50% of her target variable incentive for achieving 50% of her quota).

14.     In the event Defendant exceeded her quota, the 2021 GIP provided a "payout curve" pursuant to which the proportion of incentive payments would increase, to a point, relative to her target variable incentive based on the extent to which quota attainment exceeded 100%.  For example, the payout ratio for Defendant doubled for quota attainment between 100%-250% but returned to a 1:1 ratio for attainment in excess of 300% quota attainment.

15.     In 2021, Defendant's sales quota was $3,600,804.00 and her variable incentive target was $160,000.

16.     Generally, the value credited to Defendant's quota for a given sale or deal was based on the "annual contract value" ("ACV"), which was calculated as the "total contract value" ("TCV") divided by the total months in the term of the contract, which amount was then multiplied by 12 to yield the ACV (*i.e.*, TCV / total contract term in months x 12).  For example, the ACV for a five-year/60-month deal with a TCV of $5,000,000.00 would be $1,000,000.00 ($5,000,000.00 / 60 = $83,333.33 x 12 = $1,000,000.00).  In other words, Defendant would receive quota credit equivalent to the one-year value of a multi-year deal.

17.     Pursuant to the QCRs, the ACV to be credited against Defendant's sales quota could be adjusted upward or downward in different circumstances.  For example, the Plan incentivized sales of longer contracts or certain products by offering various multipliers to increase the ACV for which Defendant would otherwise receive a quota credit.  Application of these multipliers would help Defendant achieve or exceed her quota more quickly and potentially earn higher incentive payments in accordance with the applicable payout curves.

DM2\17231294.4

18. In addition to setting forth the rules governing eligibility for and calculation of incentive compensation under the Plan, the Plan provides SAP with broad discretion to review incentive compensation payments and, if necessary, reverse and recoup them in the event of overpayments and other errors. Among other relevant provisions, the 2021 GIP provides:

> The Company may make incentive payments based upon preliminary financial results for the benefits of its employees. However, in the event that preliminary results differ from final results, the Company has and reserves the right to adjust such payments either up or down, and to recover any overpayments resulting from such differences or otherwise from Plan Participants to the extent permitted by local law.

\* \* \*

> [I]f a Plan Participant's calculated Plan Year incentive earnings are less than the total payment advanced to the Plan Participant during the Plan Year, a balance will be owed to the Company. Such over payments will be carried forward and recovered in the following Plan Year from incentive earnings or other compensation. The Plan Participant will be responsible for reimbursing the Company for the owed balance.

\* \* \*

> The Plan Participant acknowledges and agrees that the Company has and reserves the right to the fullest extent permitted by applicable law, [to] recover from any commissions, incentives, or bonuses amounts overpaid as a result of revenue not received or amounts deemed non-payable on a contract or other customer arrangement that was reversed, cancelled or deemed uncollectible. In such cases the Plan Participant acknowledges and agrees that they may be required to refund monies to the Company, and the Plan Participant specifically authorizes the Company to deduct any monies owed to the Company from any commissions, incentives, bonuses, or discretionary amounts, or any other compensation payable to the Plan Participant to the extent permitted by applicable local law.

\* \* \*

> The Company reserves the right to review and, in its sole discretion, adjust or require repayment of incentives payments resulting from any errors in incentives processes or calculations.

19. In light of the foregoing and similar provisions in the Plan, Defendant was aware of and contractually bound by the foregoing Plan terms authorizing SAP to review and recoup or

require Defendant to refund commission or incentive payments in various circumstances, including in the event or an error in incentive payment processes or calculations or if such payments were the result of any "customer arrangement that was reversed [or] cancelled[.]"

20. Defendant likewise contractually and "specifically authorize[d] the Company to deduct any monies owed to the Company from any commissions, incentives, bonuses or discretionary amounts, or any other compensation payable to" Defendant in such circumstances.

21. The dispute between the parties to this action concerns the amount of commission payments (if any) to which Defendant is entitled under the Plan in connection with a deal that closed on or about September 27, 2021. Specifically, in early 2020, one of SAP's customers (the "Customer") requested a major restructure of their license agreement and asked to suspend support fees on unused licenses purchased in an earlier deal. After several months of negotiations slowed by the global pandemic, the Customer escalated its demand and requested that SAP refund several million dollars for unused licenses and maintenance fees, as well as the termination of future maintenance fees.

22. Given the importance of the Customer's relationship to SAP, SAP negotiated a deal with the Customer whereby SAP would not refund licenses or maintenance, but agreed that the Customer could terminate maintenance fees on licenses worth $72.9M (and saving $12.3M in support fees per year). In addition, the Customer agreed to purchase additional products and services, including $2M in additional software and a 60-month, $16.5M TCV / $3.3M ACV deal for Signavio Business Process Management Cloud software.

23. Defendant was part of the SAP team that helped close the deal (the "Customer Deal") and, given that her sales quota was based on sales of cloud software and services, she claims she should have received significant quota credit in connection with sale of $3.3M ACV

of Signavio software.

24. Specifically, the QCRs provided for a 1.7 quota credit multiplier for cloud product deals greater than 36 months as well as 1.5 "Catapult" uplift multiplier, both of which multipliers ordinarily would have applied to the Signavio component of the Customer Deal.

25. Ultimately, the Customer Deal closed in late September 2021 and, in Quarter 4 of 2021, Defendant received an inadvertent commission payment of $598,958.39 in connection with the Customer Deal, reflecting application of the 1.7 and 1.5 quota credit multipliers and quota attainment of 343%.  Application of these multipliers significantly increased the quota credit and resulting commission payment Defendant would have otherwise received.

26. Shortly after making Defendant's commission payment, SAP realized that it had inadvertently miscalculated the payment, including by applying the 1.7 and 1.5 multipliers. Specifically, SAP erred because it did not apply the proper QCRs that govern when a transaction involves the termination of maintenance fees, which were a significant component of the Customer Deal.

27. The governing QCRs specify that, in any deal—like the Customer Deal—for new cloud products or services that involves a cancellation of maintenance fees, Defendant would receive "[n]o compensation if factors defined for the length of term are not met, even if exception was granted to execute the deal for a lesser term and/or lower subscription fees." Specifically, to be eligible for any quota credit and corresponding incentive payment on such a deal, the ACV on a five-year deal was required to be at least 140% of the annual maintenance revenue cancelled in connection with it.

28. The Customer Deal was a five-year deal, but the $3.3M ACV associated with it was not 140% of the annual maintenance revenue terminated in connection with the Deal and

was instead significantly lower than that amount. As such, and per the binding terms of the applicable QCRs, Defendant was not entitled to any quota credit or compensation in connection with the Customer deal, much less to application of the 1.7 and 1.5 quota credit multipliers on which the calculation of Defendant's commission payment had been based.

29. Nevertheless, SAP recognized Defendant's hard work in helping to close the deal. Although the QCRs provided that Defendant should receive no credit or compensation for the Customer Deal, SAP voluntarily granted a discretionary exception allowing Defendant to receive 100% quota credit (*i.e.*, 1.0 ACV) on the $3.3M ACV component of the Customer Deal.

30. Consequently, SAP determined that Plaintiff was entitled to a revised incentive payment of $239,555.41, reflecting quota attainment of 200.95%. As such, SAP likewise determined that it had overpaid Plaintiff $359,402.98 in connection with the Customer Deal.

31. In early January 2022, SAP notified Defendant that it would, pursuant to the binding terms of the Plan to which Defendant had agreed, require repayment of the overpayment from her future commissions. Thus, Defendant was allowed to retain the overpayment, but understood that, as authorized by the Plan's express terms to which she had agreed, the amount of the overpayment would be recouped from future commission payments that would otherwise be made to Defendant.

32. Defendant requested an exception from the compensation rules, but the exception was denied. SAP determined that the $16.5M total sale of new cloud product would not have been possible without the accompanying termination of $72.9M in maintenance fees that was part of the Customer Deal. SAP determined that granting an exception to the applicable QCRs to allow a 100% quota credit on the $3.3M ACV (rather than no compensation at all) was a fair result in light of the circumstances and proper under the applicable terms of the Plan.

33. SAP communicated its denial of the exception request to Defendant in April 2022 and explained its reasoning.

34. Unhappy with SAP's decision and seeking prevent SAP from recouping any more of the overpayment from Defendant's future commissions and payments, Defendant voluntarily resigned from SAP on May 6, 2022.  By that date, SAP had only recouped approximately $126,685.41 of the $359,402.98 Defendant owed.

35. Defendant still owes SAP $232,717.57.

36. Defendant disputes that she owes SAP any money at all, and claims that she is entitled to the full value of the commission originally paid to her, notwithstanding SAP's inadvertent mistake in calculating it and the binding terms of the Plan to which Defendant does not dispute she agreed.

37. Defendant, through counsel, sent a letter to SAP claiming her entitlement to these amounts and, specifically, demanding the return of the approximately $125,000 SAP recouped from her, including an alleged $101,117.78 in waiting-time penalties under California law. Plaintiff seeks a total of at least $265,700.79 from SAP and has threatened to assert a variety of claims under California law despite the fact that she is contractually bound by the Plan, which expressly provides for the application of Pennsylvania law and applicable federal laws.

## COUNT I

## DECLARATORY JUDGMENT

38. The averments of Paragraphs 1 through 37 are incorporated by reference herein, with the same force and effect as if set forth in full below.

39. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), states in relevant part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

40. Defendant claims that SAP owes in excess of $125,000 in recouped incentive payments for work in connection with the Customer Deal. Defendant claims that the terms of the Plan entitle her to the full amount of commissions originally paid to her in connection with the Customer Deal, and that SAP's recoupment of any amount against her future commissions prior to her resignation from SAP was improper and a breach of contract, *i.e.*, the Plan.

41. Defendant has also threatened a variety of claims under California law, and seeks an additional $140,000 in damages, penalties, and fees in connection with those claims.

42. Defendant's claims are contrary to the plain language of the Plan. SAP contends that it has not breached the Plan's terms and does not owe Defendant any money.

43. To the contrary, SAP's has at all times complied with the Plan's terms, including those authorizing the adjustment and repayment of incentive payments under the circumstances described herein.

44. SAP contends that Defendant still owes SAP $232,717.57 under the terms of the Plan and that her retention of that amount is contrary to the terms of the Plan.

45. Because Defendant has recently threatened litigation over the foregoing dispute, despite the fact that the incentives are governed by contract law and the terms of the Plan, and that the exclusive forum provision in the Plan requires that any claim arising from the Plan can only be brought in the Eastern District of Pennsylvania or the Court of Common Pleas of Delaware County, there is a real and actual controversy that is ripe for judicial determination as to whether Defendant is entitled to whether, under the terms of the Plan, (1) SAP owes Defendant any money in connection with the Customer Deal as described herein; (2) Defendant owes SAP any money in connection with the Customer Deal as described herein; and (3)

whether Pennsylvania law applies to the exclusion of any claims threatened by Plaintiff under California law.

46. A declaratory judgment is an appropriate remedy because the determination sought will resolve the controversy and the interests of the parties will be best served by a judgment setting forth the rights of the parties with respect to this dispute.

47. A declaratory judgment is particularly appropriate for issues of contractual interpretation.

WHEREFORE, Plaintiff SAP respectfully requests that this Court enter judgment in its favor and against Defendant Arlene Capsimalis as follows:

  i. Determining and declaring that SAP has completely fulfilled its obligations under the Plan;

  ii. Determining and declaring that SAP does not owe Defendant any incentives in connection with the Customer Deal;

  iii. Determining and declaring that Defendant was overpaid $232,717.57 in connection with the Customer Deal and, under the terms of the Plan, owes and is obligated to pay that amount to SAP;

  iv. Determining and declaring that Pennsylvania and any applicable federal law applies to this action pursuant to the terms of the Plan and that California law therefore does not apply to this action; and

  v. Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  February 24, 2023

*/s/ Brian W. Sullivan*
Brian W. Sullivan (PA ID 208728)
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
Tel: (215) 979-1221
Fax: (215) 501-5546
bsullivan@duanemorris.com